IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ELYES CHEBBI,

                  Plaintiff,

      v.

GLADSTONE AUTO, LLC,

                  Defendant.

No. 03:10-CV-1560-HZ

OPINION & ORDER

Aaron W. Baker
Attorney at Law
650 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204

        Attorney for Plaintiff

Heather A. Bowman
Molly Jo Mullen
Bodyfelt Mount Stroup & Chamberlain
707 SW Washington Street, Suite 1100
Portland, OR 97205

        Attorneys for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Elyes Chebbi brought this race discrimination case against Defendant Gladstone Auto, LLC.  Defendant moves for summary judgment on all claims.  I grant in part and deny in part the motion.

BACKGROUND

Plaintiff worked as a car salesman for Defendant from April 20, 2009 until he quit on August 30, 2010.  Decl. David Elder Supp. Mot. Summ. J. ("Elder Decl.") ¶ 4.  Plaintiff had worked for Defendant twice previously, quitting once and being terminated once.  Id. at ¶ 6. Plaintiff was born in France to Tunisian parents, and lived in Tunisia.  Decl. Aaron Baker Resp. Mot. Summ. J. ("Baker Decl.") Ex. 3 at 2-3.  He identifies himself as North African, African American, and Muslim Arabic.  Id. at 69-70.

Plaintiff cites to several incidents as the basis for his case.  In the summer of 2009, Rich Stiefel, the general sales manager of Gladstone, ordered pepperoni pizza for the sales staff.  Elder Decl. ¶ 11.  Plaintiff does not eat pork because of his religion.  Decl. Heather Bowman Supp. Mot. Summ. J. ("Bowman Decl.") Ex. 1 at 36.  Stiefel did not order another pizza for Plaintiff and two other employees, Marwan Mousleh and Hussein Adel, who also could not eat pork for the same reason.  Baker Decl. Ex. 1 at 28.  Adel complained to David Elder, general manager of Gladstone, about not being able to eat the pizza.  Elder Decl. ¶ 11.  Elder reprimanded Stiefel and educated him about Muslim dietary restrictions.  Id.  At the time Stiefel ordered the pizza, he did not realize that pepperoni was made of pork.  Baker Decl. Ex. 1 at 27.  Stiefel apologized to Adel.  Elder Decl. ¶ 11.

In October 2009, Plaintiff heard another Gladstone salesman, David Giraldo, call Mousleh a "camel jockey" and a "fucking sand nigger".  Bowman Decl. Ex. 1 at 9, 11.  Mousleh

reported the incident to Elder.  Elder Decl. ¶ 12.  Elder investigated Mousleh's complaint with Stiefel's help.  Id.  Elder learned that Mousleh had started the argument by calling Giraldo a "fucking Colombian".  Id.  Giraldo and Mousleh were both given written warnings for the incident.  Elder Decl. Exs. 4-5.  Both men were warned that another similar incident would result in termination and both were required to apologize to their co-workers, Plaintiff included, who witnessed the argument.  Id.; Elder Decl. ¶ 12.  Even after the written warnings, Giraldo made comments a couple times per week about "riding camels", "going to school on a camel", and "camel jockey" to Plaintiff.  Bowman Decl. Ex. 1 at 16.  Giraldo also said "sand nigger" under his breath as he walked by Plaintiff.  Id. at 17.  Plaintiff alleges that he complained to Elder and Stiefel, but no action was taken.  Id. at 18-19.  Elder disputes that Plaintiff complained to him about Giraldo's continued name-calling.  Elder Decl. ¶ 13.  Plaintiff also heard co-worker Daniel Lara call Mousleh a "camel jockey", but did not specify when this occurred or if he reported the incident.  Id. at 14.

After the incident in October 2009, Plaintiff heard co-worker James Golden refer to a customer as a "nigger", but did not report it to management.  Bowman Decl. Ex. 1 at 15.

Also in 2009, Plaintiff and co-worker Oscar Hadad were having a conversation about how to refer to other nationalities in Spanish.  Id. at 22.  For example, Plaintiff asked Hadad the Spanish word for people from Guatemala, and Hadad answered Guatemalteco.  Id.  When Plaintiff asked about people from the Caribbean, Hadad did not know.  Id.  Giraldo chimed in and answered "negroes".  Id.  Plaintiff complained to Stiefel, but Stiefel did not take any action. Id. at 23.

In an undated incident, Plaintiff was standing with Jeff Karlin, a co-worker, and somebody commented about a conspiracy theory regarding the September 11, 2001 attacks on

the United States—that it was an "inside job". Id. at 26.  Stiefel walked by, and the person

talking told him about the conspiracy theory.  Id.  Stiefel disagreed and according to Plaintiff,

said that "Muslim terrorists did it".  A female customer wearing a head scarf was sitting across

the showroom, and Stiefel pointed at her as an example.  Id.  Plaintiff also states that Stiefel

suggested nuking the Middle East.  Id. at 26-27.  Another time, Plaintiff heard Stiefel say

something similar to "911 alert" when a customer wearing a head scarf came into the dealership.

Id. at 28.  Plaintiff did not report Stiefel's comments to Elder.  Id. at 30.

       In another undated incident, Plaintiff and Elder were watching news about the war in

Iraq.  Id. at 24.  The news reported that the war was turning into a civil war between two

different sects.  Id.  According to Plaintiff, Elder commented that the civil war was good for the

U.S. and to "let them kill each other".  Id.  Elder denies making such a comment.  Elder Decl. ¶

19.  Plaintiff claims that he did not tell Elder that he was offended because he was scared of

getting fired and felt that Elder would not be responsive to the complaint.  Bowman Decl. Ex. 1

at 25.

       In another undated incident, Plaintiff witnessed co-worker Jason Brown show Mousleh a

membership card that had a map of the Middle East on it.  Id. at 50.  Brown asked Mousleh, who

is Palestinian, to show him Palestine on the map.  Id.  Mousleh pointed on the map, but Brown

said "no, that's Israel".  Id.  Brown also had a Jewish star on his locker and a picture of Ariel

Sharon, Israel's former Prime Minister, inside of his locker.  Id. at 51.  Plaintiff believes that

Adel may have complained about the star and picture of Sharon.  Id.  Elder took the items down

or asked Brown to remove them, but the picture of Sharon returned later.  Id.

       In other undated incidents, Mousleh showed Plaintiff notes that he had received at work

in his locker.  Baker Decl. Ex. 3 at 51, 54.  The first note had "Arab Fuckari" written on it along

with a picture of a camel.  Id. at 52-53.  Plaintiff suspects it was Giraldo who wrote the note because he had used the phrase before.  Id.  The second note had a picture of a tank and a statement about Israelis and Palestinians.  Id. at 55.  There is no evidence that Plaintiff complained about these acts.

In December 2009, Plaintiff was promoted to floor manager (aka "closer").  Elder Decl. ¶ 5.  One of his team members, Fatima Assafi, reported to him that she was being sexually harassed by other team members, Zac Caverhill and Joe Chambers.  Baker Decl. Ex. 3 at 5-6.  Caverhill texted Assafi, calling her "nipples", and on another occasion, picked her up from behind.  Id. at 6-7.  Chambers made Assafi feel uncomfortable, but no particular conduct is detailed.  Id. at 6.  Plaintiff reported the sexual harassment to Elder.  Id.  Elder disputes this assertion.  Elder Decl. ¶ 17.

On January 8, 2010, Plaintiff voluntarily stepped down as floor manager and returned to being a salesman.  Id.  On January 15th, Plaintiff spoke to Angela Viol, the Office Manager, about several complaints.  Bowman Decl. Ex. 1 at 32.  Laurie Park from payroll was also there for the meeting.  Id.  The meeting was memorialized in a memo.  Id. at Ex. 4.  Chebbi stated that he stepped down as floor manager because Stiefel unfairly gave Internet deals to Chambers, his request to have Mousleh on his team was denied, Chambers was trying to steal deals from Assafi, and Giraldo was put on his team.  Id.  Plaintiff brought up the pizza incident from 2009. Id.  He also complained about how Stiefel credited deals originating from "phone ups" and "take ups".  Id.  After the memo was written, Plaintiff met with Elder and Stiefel to discuss the complaints.  Bowman Decl. Ex. 1 at 35-36.  At the bottom of the memo, Elder handwrote that Stiefel and he "discussed all matters above and have resolved them to Elyes Chebbi's satisfaction."  Id. at Ex. 4.  All three men's signatures appear under this statement.  Id.  Plaintiff

now disputes that the matters were resolved to his satisfaction.  Id. at Ex. 1 at 38.  He felt

intimidated, and that he was forced to sign the memo.  Id.  Plaintiff had asked to speak to Maria

Smith, the owner of Defendant Gladstone, but instead found himself meeting with Stiefel and

Elder—the people who he had complained about.  Id.  Gladstone's anti-harassment policy lists

both Elder and Smith as the contact person for complaints.  Bowman Decl. Ex. 5.

After the January meeting, Plaintiff felt that Stiefel and Elder treated him differently.

Stiefel yelled at Plaintiff several times when he brought deals for Stiefel's approval, was rude,

and threw papers on the ground.  Id. at 44-45.  Plaintiff believes that Stiefel was trying to prevent

him from being the number one car salesman.  Id. at 41.  Plaintiff alleges that Elder frequently

took him into his office and yelled at him.  Id.  Elder also accused Plaintiff of going to human

resources behind his back.  Id. at 42.

In June 2010, Caverhill came up from behind and pushed down on Plaintiff's shoulders.

Id. at 55.  Plaintiff heard a loud pop in his back.  Id. at 56.  Plaintiff had back pain and filed a

workers' compensation claim.  Id. at 57.  He complained to Elder about the incident.  Baker

Decl. Ex. 3 at 66.  Elder talked to Caverhill and issued a warning.  Elder Decl. ¶ 23.  He also told

all the sales staff to not touch other employees.  Id.

Plaintiff quit Gladstone on August 30, 2010.  He called Gladstone and spoke to Park

about quitting.  Bowman Decl. Ex. 1 at 53.  He asked Park to tell Smith, Gladstone's owner, to

call him.  Id.  Smith never called Plaintiff.  Id.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court views inferences drawn from the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

Plaintiff Chebbi brings state and federal claims against Defendant Gladstone for race discrimination, hostile work environment, and retaliation in violation of ORS § 659A.030 and 42 U.S.C. § 1981. Plaintiff also alleges a claim for retaliation under ORS § 659A.199 and negligence. In Plaintiff's response, he concedes the claim for negligence. Chebbi's Resp., 17. Defendant moves for summary judgment on all the remaining claims.

I.    Statute of Limitations

Plaintiff concedes that the evidence is limited to Plaintiff's most recent employment period even though he had worked for Defendant twice before.  Chebbi's Resp., 12.  For section 1981 claims, the statute of limitations is provided by state law.  <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454, 462 (1975).  Oregon has a two-year statute of limitation for injuries not arising from a contract.  ORS § 12.110(1).  Plaintiff filed his complaint on December 23, 2010.  Therefore, incidents that occurred before December 23, 2008 are barred.  Because Plaintiff's start date was April 20, 2009, all incidents in Plaintiff's most recent employment period are within the statute of limitations.  Def.'s Memo. Supp. Mot. Summ. J. ("Gladstone MSJ"), 15.

Plaintiff's state claims under ORS §§ 659A.030 and 659A.199 are governed by a separate statute of limitations.  These claims have a one-year statute of limitations.  ORS § 659A.875(1).  Thus, incidents that occurred before December 23, 2009 cannot be used to support Plaintiff's state claims.

Plaintiff argues that the continuing tort doctrine applies in his case, such that all the incidents may be considered for his state claims.  "A continuing tort is based on 'the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct.'"  <u>Barrington v. Sandberg</u>, 164 Or. App. 292, 296 (1999) (quoting <u>Davis v. Bostick</u>, 282 Or. 667, 671 (1978)).  Where the evidence is that a plaintiff was harmed by each act in a series, the continuing tort theory does not apply.  <u>Id.</u> at 297, (citing <u>Davis</u>, 282 Or. at 674-75); <u>see</u> <u>also</u> <u>Griffin v. Tri-Met</u>, 112 Or. App. 575, 581-82 (1992) (finding that each incident of a series did not by itself support a claim, but the incidents as a whole were a systematic pattern of

conduct that led to a specific injury), rev'd in part on other grounds, 318 Or. 500, 870 P.2d 808 (1994).

Under this doctrine, "'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges', while 'a hostile work environment claim … will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period'[.]" Lyons v. England, 307 F.3d 1092, 1105-1106 (9th Cir. 2002) (quoting AMTRAK v. Morgan, 536 U.S. 101, 113 (2002)). Thus, if applicable, the continuing tort doctrine would only apply to Plaintiff's state hostile work environment claim for incidents that were part of a systematic pattern of conduct that resulted in an injury.

The following incidents occurred before December 2009 and are precluded by the state statute of limitations: the pepperoni pizza incident, co-worker Giraldo calling another co-worker "camel jockey" and "sand nigger", co-worker Golden calling a customer a "nigger", and Giraldo stating that people from the Caribbean are called "negroes" in Spanish. None of these acts alone would support a claim for hostile work environment. Consideration of these incidents depends on whether the continuing tort theory is applicable, which will be discussed below.

II.    Discrimination

There are three types of discrimination claims under ORS § 659A.030 and 42 U.S.C. § 1981: disparate treatment, hostile environment, and retaliation. The substantive analysis is the same for all three types of claims under both the federal and state statutes. Campbell v. Knife River Corp. - Northwest, 783 F. Supp. 2d 1137, 1147 (D. Or. 2011) (standard for establishing a prima facie case of discrimination under ORS § 659A.030 is identical to that used to establish a prima facie case of discrimination under Title VII); Manatt v. Bank of America, NA, 339 F.3d

792, 797 (9th Cir. 2003) ("legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action"); Logan v. West Coast Benson Hotel, 981 F. Supp. 1301, 1319 (D. Or. 1997) (discrimination claims under Chapter 659 are "wholly integrated and related" to Title VII).

There are two ways that Plaintiff may establish a prima facie case of discrimination. Plaintiff may present evidence of discriminatory intent that gives rise to an inference of unlawful discrimination.  Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003); Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1149 (9th Cir. 1997) (referring to an employee as a "dumb Mexican" is direct evidence).  Alternatively, Plaintiff may show that (1) he belonged to a protected class, (2) was qualified for the position in question, (3) was subjected to an adverse employment action, and (4) others who were not in the protected class were treated more favorably.  E.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (citations omitted).  Establishing a prima facie case creates a presumption of unlawful discrimination.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If a prima facie case is established, the burden of production shifts to the defendant, who must show evidence that the adverse action was taken for other than impermissibly discriminatory reasons. See id.  If the defendant produces such evidence, the presumption of unlawful discrimination disappears, and the plaintiff must show by a preponderance of the evidence that the employer's proffered reason was merely a pretext for a discriminatory motive.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (citing Lowe v. City of Monrovia, 775 F.2d 998, 1007 (9th Cir. 1985)).

To do so, the plaintiff cannot simply rely upon the prima facie case and deny the credibility of the defendant's witnesses.  Id. at 890 (citing Schuler v. Chronicle Broadcasting Co., Inc., 793 F.2d 1010, 1011 (9th Cir. 1986)).  Instead, the plaintiff must produce "specific,

substantial evidence of pretext." <u>Wallis</u>, 26 F.3d at 890 (quoting <u>Steckl v. Motorola, Inc.</u>, 703 F.2d 392, 393 (9th Cir. 1983)).  Pretext may be established either by showing that "a discriminatory reason more likely motivated the employer or ... that the defendant's proffered explanation is unworthy of credence." <u>Chuang v. University of California Davis</u>, 225 F.3d 1115, 1123 (9th Cir. 2000).  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated always rests with the plaintiff. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142-43 (2000).

A.     Disparate Treatment

Plaintiff claims race discrimination in violation of § 1981 and ORS § 659A.030 because he is African American.  Plaintiff argues that there is direct evidence of discrimination shown by Plaintiff "being hounded by management, not receiving car deals, comments and yelling by management, and being physically assaulted." Chebbi Resp., 10.  Plaintiff does not cite to evidence in support of this argument, nor is race implicated by these general allegations.  I cannot find that there was any evidence of direct discrimination based on this brief, and unsupported, argument.

Alternatively, to establish a prima facie case of race discrimination, Plaintiff can show (1) that he is African-American; (2) that he performed his job adequately; (3) that he suffered an adverse employment action; and (4) that similarly situated individuals outside his protected class were treated differently. <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1031 (9th Cir. 2006).

Defendant challenges that Plaintiff is African American, but concedes this point for the purpose of this motion.  Gladstone MSJ, 14 n3.  Defendant does not argue that Plaintiff did not perform his job adequately.  Thus, only the last two elements are at issue—whether Plaintiff

suffered an adverse employment action and whether similarly situated individuals outside Plaintiff's protected class were treated differently.

In a discrimination claim, an adverse employment action "materially affects the compensation, terms, conditions, or privileges of employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (quotation, brackets, and ellipsis omitted). Adverse actions include subjecting an employee to verbal and physical abuse, discriminatory overtime, and termination. Kang v. U. Lim Am., Inc., 296 F.3d 810, 818-19 (9th Cir. 2002); see also Chuang v. University of Cal. Davis, 225 F.3d 1115, 1123 (9th Cir. 2000) (relocation and reduced size of research space were adverse employment actions). However, there is no adverse employment action when a job demotion is not accompanied by a salary or status change, or any indication that the new position is less favorable. Campos v. Portland Public Schs., No. 99-1744-MA, 2000 U.S. Dist. Lexis 21617, at *16-17 (D. Or. Nov. 9, 2000).

Plaintiff argues three adverse employment actions: (1) stepping down from his promotion as a floor manager (aka "closer"), (2) lost car deals, and (3) fleeing from various locations in the dealership to avoid harassment. Chebbi's Resp., 11. At the time Plaintiff voluntarily stepped down from floor manager, he had told Elder that he wanted to return to sales because he was more successful in sales than as a manager. Elder Decl. ¶ 5. But now, Plaintiff states he stepped down because of favoritism towards another employee, a lack of response to his report that Assafi was being harassed, and Giraldo being put on Plaintiff's team in exchange for another salesman that did not want to be on Plaintiff's team. Bowman Decl. Ex. 1 at 7.

Regardless of why Plaintiff stepped down a month after his promotion, the incident is not cognizable as an adverse employment action. Plaintiff provides no evidence of how returning to a salesman position materially affected his compensation, terms, conditions, or privileges of

employment.  The fact that Plaintiff's return to being a salesman was voluntary is not dispositive, but there is undisputed evidence that Plaintiff's average income as a salesperson was higher than his stint as a floor manager.  Elder Decl. ¶ 5.  Likewise, Plaintiff has not shown that Defendant caused him to move to different parts of the dealership nor that it materially affected his employment.  Finally, Plaintiff's evidence of lost car deals consists of testimony that Stiefel ignored him and "threw a deal on the ground once" and that Caverhill was "not taking [his] deals".  Baker Decl. Ex. 3 at 48, 50.  Defendant argues that Plaintiff relies on conclusory allegations and has not come forth with any factual support to show that he lost car deals.  In the light most favorable to the nonmoving party, I agree that Plaintiff has not met his burden to show that he actually lost car deals.  Beyond those two statements about Stiefel and Caverhill, Plaintiff does not further specify the details of those incidents.  Because Plaintiff has failed to show an adverse employment action, his claims for race discrimination fails.  Defendant's motion is granted on Plaintiff's federal and state claims for race discrimination.

B.    Hostile Work Environment

To establish a prima facie case for a hostile work environment claim, Plaintiff must show (1) he was subjected to verbal or physical conduct based on his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.  Surrell v. California Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir. 2008).  The workplace must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher, 524 U.S. at 787; Nichols, 256 F.3d at 871-872.  "In evaluating the objective hostility of a work environment, the factors to be considered include the 'frequency of discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" McGinest, 360 F.3d at 1113 (quoting Nichols, 256 F.3d at 872).

Furthermore, "[s]imply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment". McGinest, 360 F.3d at 1113. However, it is sufficient to show that the conduct "pollute[d] the [plaintiff's] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." Id. In short, the "conduct must be extreme to amount to a change in the terms and conditions of employment". Faragher, 524 U.S. at 788.

Defendant disputes the first and third elements—that Plaintiff was subjected to verbal or physical conduct based on his race or that the conduct was sufficiently severe or pervasive. Plaintiff fails to specify the evidence that supports his claim for hostile work environment. Plaintiff refers to a lengthy fact section and simply argues that he "has presented ample evidence to show that his work environment, viewed from the perspective of a reasonable person with the same 'race' was objectively hostile." Chebbi's Resp., 15. Plaintiff's failure to cite to specific evidence makes the court's work extremely challenging. "If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search." Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012).

That said, given the nature of a hostile work environment claim, I am obligated to consider all the circumstances in determining whether the harassment was sufficiently severe or pervasive to alter the conditions of employment. In light of the numerous incidents that Plaintiff has recounted, some of which are well within the statute of limitations, I find that a reasonable

trier of fact could conclude that Plaintiff was subjected to a hostile work environment because of his race.

Defendant argues that in the majority of the incidents, Plaintiff was a witness.  "If racial animus motivates a harasser to make provocative comments in the presence of an individual in order to anger and harass him, such comments are highly relevant in evaluating the creation of a hostile work environment, regardless of the identity of the person to whom the comments were superficially directed.  McGinest, 360 F.3d at 1118.  In the light most favorable to the nonmoving party, I cannot find that the incidents alleged were not meant to anger or harass Plaintiff as a bystander.  The most pervasive conduct was Giraldo's continued comments about camels and sand nigger, which Plaintiff states occurred a couple of times a week.  These incidents, in their totality, are sufficient to overcome Defendant's motion.

However, not all of Plaintiff's incidents were racially motivated.  The pizza incident for example occurred because Stiefel did not know about a Muslim's dietary restrictions.  Plaintiff has not presented evidence to the contrary.  Plaintiff also generally alleges that Stiefel yelled at him, that Stiefel showed favoritism to another co-worker, and that Elder did not like Plaintiff speaking with human resources.  There is no indication, even drawing reasonable inferences in favor of Plaintiff, that any of these events were racially motivated.  Further, Plaintiff is not of Palestinian descent.  Plaintiff has not shown how comments about Palestine would be subjectively offensive to him.

In summary, there is a genuine dispute of material fact concerning Plaintiff's federal and state claims for hostile work environment.

Defendant argues that even if Plaintiff establishes a prima facie case for hostile work environment, it is doubtful that Defendant would be liable.  "An employer's liability for

harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker." McGinest, 360 F.3d at 1119. If the harasser is a co-worker, as in the case here, the conduct is reviewed under a negligence standard. Nichols, 256 F.3d at 875. Plaintiff must prove that the employer knew or should have known about the harassment, but did nothing to address it. McGinest, 360 F.3d at 1119. It is undisputed that Elder investigated and reprimanded the employees involved in the October 2009 name-calling incident. But the name-calling continued, and Plaintiff claims that he reported the subsequent camel comments to management. Although this claim is disputed by Elder, in the light most favorable to the nonmoving party, Plaintiff has presented evidence that management knew about the continued name-calling. Defendant's motion is denied with respect to Plaintiff's hostile work environment claims.

C.    Retaliation

To establish a prima facie case of retaliation, Plaintiff must prove (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two. Surrell, 518 F.3d at 1109. The definition of an adverse employment action in a retaliation claim is broader than that for a disparate treatment discrimination claim. Burlington N. & Santa Fe Rwy Co. v. White, 548 U.S. 53, 60-63 (2006). An adverse employment action is defined broadly as an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination". Id.; see also Manatt, 339 F.3d at 800 (adverse employment action is "any employment decision 'reasonably likely to deter employees from engaging in protected activity.'") (quoting Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000)).

Plaintiff generally states that he made complaints to management. Chebbi's Resp., 16. Much of Plaintiff's evidence is irrelevant for this claim because he did not complain about the

allegedly discriminatory conduct.  Plaintiff states he complained about co-worker Giraldo's

continued comments and Assafi's sexual harassment, Giraldo's reference to Caribbean people as

"negroes", that Stiefel showed favoritism to another co-worker, and Plaintiff's back was injured

by a co-worker.   None of these complaints are related to Plaintiff's allegations of race

discrimination.  Plaintiff has not shown that he engaged in a protected activity.

       The two adverse employment actions that Chebbi asserts are Defendant's "attack" of him

and a lack of response for the complaints that he made.  Id.  Plaintiff's first alleged adverse

employment action, that Defendant attacked him, suffers from a lack of specificity.  Plaintiff

does not elaborate on the attack or cite any evidence in support of his argument.  There is

nothing in the record to base a finding upon general allegation of an "attack".  Plaintiff's second

alleged adverse employment action—lack of response to Plaintiff's complaints—also suffers

from the same problem.  The record shows that Defendant investigated the October 2009

incident and met with Plaintiff in January 2010 to discuss other complaints.  Moreover,

Plaintiff's allegations do not indicate a time frame for his complaints.  Without knowing the

timing of the complaint, Plaintiff cannot establish the last element of causation.  Defendant's

motion is granted for Plaintiff's retaliation claims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

17 - OPINION & ORDER

CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment is denied for

Plaintiff's state and § 1981 hostile work environment claims and granted for Plaintiff's disparate

treatment and retaliation claims under both the state and § 1981 statutes.

IT IS SO ORDERED.

Dated this _____ day of July, 2012.

MARCO A. HERNANDEZ
United States District Judge